# FOR PUBLICATION

For Publication



FILED & ENTERED

AUG 24 2017

CLERK U.S. BANKRUPTCY COURT
Central District of California
BY egarcia    DEPUTY CLERK

# UNITED STATES BANKRUPTCY COURT
# CENTRAL DISTRICT OF CALIFORNIA
# LOS ANGELES DIVISION

| | |
|---|---|
| In re:<br><br>Ridgecrest Healthcare, Inc.,<br><br>Debtor. | Case No. 2:13-bk-33058-DS<br><br>Chapter 7<br><br>**MEMORANDUM DECISION ON OBJECTION TO CLAIM**<br><br>Date:    January 4, 2017<br>Time:    10:30 a.m.<br>Place:   Courtroom 1639<br>             255 East Temple Street<br>             Los Angeles, CA 90012 |

## I.    Factual Background

Ridgecrest Healthcare, Inc. (the "Debtor") filed a chapter 11 petition on September 16, 2013. The case was converted to chapter 7 on September 4, 2014. Howard Ehrenberg is the duly appointed chapter 7 trustee (the "Trustee"). Pre-petition, the Debtor operated a skilled nursing facility in Ridgecrest, California. On March 31, 2014, the California Department of Health Care Services ("DHS") filed a proof of claim asserting a general unsecured claim of $192,793.85. On February 12, 2015, DHS filed an amended proof of

1  claim asserting a priority unsecured claim for $446,609.20. The amended proof of claim
2  asserted that DHS's claim was a priority claim under section 507(a)(8).[1] On September 2,
3  2015, DHS filed a second amended claim reducing the amount of the claim to $432,250.01
4  but still asserting that the claim was a priority claim pursuant to section 507(a)(8) (the
5  "Second Amended Proof of Claim").

      DHS's claim is based on quality assurance fees ("QA Fees"). QA Fees are imposed based on DHS's administration of California's Medicaid program, Medi-Cal. The Medi-Cal program must comply with the federal Medicaid Act, Title XIX of the Social Security Act, 42 U.S.C. section 1396 (the "Medicaid Statute"). The Medicaid Statute, and regulations related thereto, permits states to impose certain health-care related taxes and to use revenues to enhance the federal financial participation in their Medicaid programs. Ultimately, QA Fees help finance Medi-Cal. QA Fees are imposed uniformly on any health care facility that provide skilled nursing care to patients whose primary need is availability of skilled nursing care on an extended basis. Cal. Health and Safety Code §§ 1250(c) and 1324.22(a). QA Fees are "based upon the entire net revenue of all skilled nursing facilities subject to the fee." Cal. Health & Safety Code § 1324.21. Specifically, "[t]he amount of the uniform quality assurance fee to be assessed per resident day shall be determined based on the aggregate net revenue of skilled nursing facilities subject to the fee." Cal. Health & Safety Code § 1324.21. Skilled nursing facilities are required to calculate, self-report, and pay QA Fees on a monthly basis. Cal. Health and Safety Code § 1324.22(a). Skilled nursing facilities then file quarterly reports that show the total resident days and amounts paid during the quarter. Cal. Health and Safety Code § § 1250(c) and 1324.22(b).

---

[1] Unless otherwise indicated, all "Code," "chapter" and "section" references are to the Bankruptcy Code, 11 U.S.C. §§ 101-1330. "Rule" references are to the Federal Rules of Bankruptcy Procedure ("FRBP"), which make applicable certain Federal Rules of Civil Procedure ("FRCP."). "LBR" references are to the Local Bankruptcy Rules of the United States Bankruptcy Court for the Central District of California ("LBR").

## II. Procedural Background

### a) Initial Bankruptcy Court Proceeding

On August 17, 2015, the Trustee filed a "Motion to Disallow Claim" (the "Motion," Docket No. 407). The Motion argued that the amount of DHS's claim was not properly calculated and that the claim was not entitled to priority under section 507(a)(8). DHS responded to the Trustee's objection to the amount of the claim by filing the Second Amended Proof of Claim on September 2, 2015, as well as an opposition to the Motion (the "Opposition," Docket No. 410). The Opposition asserted that DHS's claim was a priority claim under section 507(a)(8) because QA Fees are an excise tax on a transaction. In the Trustee's reply to the Opposition, the Trustee no longer objected to the amount of the claim based on the Second Amended Proof of Claim but continued to argue that the claim was not a priority claim, both because QA Fees are not an excise tax and further because QA Fees are not a tax at all. After oral argument, the court concluded that QA Fees were not an excise tax on a transaction and therefore DHS's claim was not a priority claim section 507(a)(8). The court entered an order granting the Motion in part[2] and allowing DHS a general unsecured claim in the amount of $432,250.01 (the "Bankruptcy Court Order," Docket No. 423).

### b) District Court Order

DHS appealed the Bankruptcy Court Order.[3] On appeal, the United States District Court for the Central District of California (the "District Court") reversed and remanded the proceeding to the bankruptcy court for further proceedings consistent with its order (the "District Court Order," Docket No. 459). The District Court Order stated that the question on appeal was whether QA Fees are an excise tax on a transaction and therefore entitled to priority under section 507(a)(8). The District Court Order discussed the relevant Ninth Circuit test for determining whether a fee is an excise tax, and concluded that the

---

[2] The Motion was only granted in part because the court did not rule on the Trustee's objection to the amount of the claim, which was resolved before the hearing when the DHS filed a second amended claim and the Trustee's reply asserted that the Trustee no longer objected to the amount of DHS's claim.

[3] The bankruptcy court granted DHS's motion for a stay of the Bankruptcy Court Order pending appeal (Docket No. 457).

bankruptcy court's oral ruling and the Bankruptcy Court Order were vague as to the basis for the decision and unclear as to whether this court had applied the Ninth Circuit test. The District Court did not apply the Ninth Circuit test itself to determine whether the QA fees are an excise tax entitled to priority. On remand, this court has endeavored to follow the District Court's order to clearly articulate the elements of the Ninth Circuit test and apply the test to its analysis of QA fees.

        c)    <u>Supplemental Bankruptcy Court Proceeding</u>

After the District Court Order was issued, this court held a status hearing on the Motion and set a schedule for supplemental briefing. Both the Trustee and DHS were permitted to file an opening brief and a responsive brief. A hearing was held on January 4, 2017 to consider these supplemental briefs and for additional oral argument.

## III.    Legal Analysis

Pursuant to section 507, unsecured claims of a governmental unit are priority claims if such claims are for "an excise tax on – . . . (ii) if a return is not required, a transaction occurring during the three years immediately preceding the date of the filing of the petition." 11 U.S.C. § 507(a)(8)(E)(ii). To determine whether DHS's claim for QA Fees is a priority claim under this section, the court first must determine whether the QA Fees are an excise tax consistent with the District Court Order. If the court determines that the QA Fees are an excise tax, then the court must then determine whether QA Fees are an excise tax on a transaction.

        a)    <u>Whether QA Fees Are an Excise Tax</u>

            i.    *Standard for Determining Whether Fees Constitute an Excise Tax*

As the District Court Order stated, the Ninth Circuit has adopted a functional five factor test for courts to apply when considering whether a fee is an excise tax. The relevant factors a court must consider are: (1) the fee is an involuntary pecuniary burden, regardless of name, laid upon an individual or property; (2) the fee is imposed by or under the authority of the legislature; (3) the fee is for public purposes, including the purposes of defraying expenses of government or undertakings authorized by it; (4) the fee is imposed

under the police or taxing power of the state; and (5) whether a private creditor similarly situated to the government can be hypothesized under the relevant statute. *In re Lorber Indus. of California*, 564 F.3d 1098, 1102 (9th Cir. 2009)("*Lorber II*"); *In re George*, 361 F.3d 1157, 1163 (9th Cir. 2004); *See also In re Carpenter*, 540 B.R. 691, 699 (B.A.P. 9th Cir. 2015)(stating that, "a five-part test has emerged for determining what constitutes a § 507(a)(8)(E) priority excise tax.").

ii. *Application of the Standard to QA Fees*

1. An Involuntary Pecuniary Burden

The court must first determine whether the QA Fees are an involuntary pecuniary burden, regardless of name, laid upon an individual or property. The Trustee argues that the QA Fees are not an involuntary pecuniary burden because the QA Fees are imposed as a result of an operator deciding to apply for a license to run a skilled nursing facility. The Trustee asserts that because skilled nursing facilities seek to engage in this business, the QA Fees are essentially contracted for by the skilled nursing facilities entering this type of business. The Trustee also argues that that the QA Fees cannot be an involuntary pecuniary burden because they are not imposed on the general population.

The court disagrees with the Trustee. In *In re Lorber Indus. of California, Inc.*, 675 F.2d 1062 (9th Cir. 1982) ("*Lorber I*"), the Ninth Circuit emphasized that what makes a fee an involuntary pecuniary burden is whether the entity charged the fee has contracted for the fee. The Ninth Circuit held in *Lorber I* that the fee charged to the debtor, a manufacturer discharging "unusually high quantities of wastewater into the sewer system" operated by the claimant in that case, was not an involuntary pecuniary burden because it was only imposed on industrial users of the trash collection system who sought to discharge large amounts of industrial wastewater. *Lorber*, 675 F.2d at 1067. The Ninth Circuit concluded that the debtor had essentially contracted to pay the additional fee in order to dispose of industrial wastewater. In contrast, QA Fees are imposed on all operators of skilled nursing facilities, not only skilled nursing facilities that engage in certain activities. To accept the Trustee's argument that skilled nursing facilities volunteer to pay

-5-

QA Fees by obtaining a license to run a skilled nursing facility would lead to the absurd conclusion that no tax could be considered an involuntary pecuniary burden. For example, applying the Trustee's logic to other taxes, it could be argued that an individual chooses to pay income taxes by making the choice to work and therefore income taxes are not an involuntary pecuniary burden.

Ultimately, QA Fees are not the result of skilled nursing facilities contracting with DHS to obtain a specific service; they are charged to all skilled nursing facilities. Because the Debtor did not contract for QA Fees, but simply had to pay QA Fees because the Debtor operated a skilled nursing facility, QA Fees are an involuntary pecuniary burden.

### 2. Imposed by or Under the Authority of the Legislature

This second factor requires the court to determine whether QA Fees are imposed by or under the authority of the legislature. The Trustee does not dispute that QA Fees are imposed by the California legislature. The court notes that QA Fees were passed by the California legislature as Assembly Bill 1629 and are codified in the California Health and Safety Code. Accordingly, QA Fees are imposed by the authority of California's legislature.

### 3. For Public Purposes

The court must next determine whether the QA Fees are imposed for public purposes. Previously, the Ninth Circuit recognized authority from other circuits that adds two elements to this factor. However, in *In re George* 361 F.3d 1157 (9th Cir. 2004), the Ninth Circuit reformulated those two elements into the fifth factor of this test.[4] The Trustee argues that QA Fees do not serve a public purpose because the fees only benefit skilled nursing facilities as they are used to provide additional reimbursements for such facilities and to support quality improvement efforts in such facilities. The Trustee also argues that granting priority to a claim based on QA Fees would prejudice any other creditor with a

---

[4] These factors, announced by the Sixth Circuit in *In re Suburban Motor Freight, Inc.*, 36 F.3d 484, 488 (6th Cir. 1994), required: "(1) that the pecuniary obligation be universally applicable to similarly situated entities; and (2) that according priority treatment to a government claim not disadvantage private creditors with like claims." The District Court Order specifically noted that *In re George* essentially eliminated these two factors. The Trustee's argument focused on the two elements that are no longer considered under this factor.

claim based on reimbursing a debtor for services. Notably, the Trustee did not point to any such creditors in this case.

The purpose of QA Fees is made clear in the statute authorizing their collection. California Health and Safety Code section 1324.25 states that funds collected from QA Fees "shall be available to enhance federal financial participation in the Medi-Cal program or to provide additional reimbursement to, and to support facility quality improvement efforts in, licensed skilled nursing facilities." Accordingly, QA Fees support the funding of Medi-Cal and reimbursement to and quality improvement efforts in skilled nursing facilities. Further, the statute imposing QA Fees, California Health and Safety Code section 1324, notes that QA Fees will only be imposed upon passage of the Medi-Cal Long-Term Care and Reimbursement Act. Cal. Health and Safety Code section 1324.28(b)(2). The Medi-Cal Long-Term Care and Reimbursement Act was passed and codified in the California Welfare and Institutions Code section 14126. The statement of purpose in that code section sheds further light on the purpose of QA Fees, stating that the legislature's intent was to "devise a Medi-Cal long-term care reimbursement methodology that more effectively ensures individual access to appropriate long-term care services, promotes quality resident care, advances decent wages and benefits for nursing home workers, supports provider compliance with all applicable state and federal requirements, and encourages administrative efficiency." Cal. Welf. & Inst. Code § 14126.02.

These statutory statements about the intent of the legislature in creating QA Fees show that the fees serve a public purpose because they support the funding of Medi-Cal, provide reimbursement and quality improvements to health care facilities, ensure access to appropriate long-term care facilities, improve the quality of care, and promote decent wages for nursing and home workers. All of these objectives serve the public purpose of ensuring that residents of the state have access to quality skilled nursing care.

4.  Under the Police or Taxing Power of the State

The court must next determine whether QA Fees are imposed under the state's police or taxing power. The Trustee argues that QA Fees are imposed primarily to provide

operators of skilled nursing facilities higher reimbursements so that such facilities can improve their quality. The Trustee then concludes that because the primary purpose of QA Fees is to provide funding to skilled nursing facilities QA Fees cannot be imposed under the state's taxing power because QA Fees do not raise government revenue and are not imposed for the benefit of all taxpayers. Notably, the Trustee concedes that QA Fees are regulatory fees.[5]

To the extent that QA Fees are regulatory fees, they are imposed under the state's policing power. Even if QA Fees are not regulatory fees, it seems apparent that the QA Fees are imposed under the taxing power of the state. Importantly, the Trustee relies on a narrow mischaracterization of the purpose of QA Fees to conclude that QA Fees cannot be a tax. As discussed above, the purpose of QA Fees is more than simply reimbursing skilled nursing facilities - QA Fees also enhance Medi-Cal funding and support facility quality improvement efforts in licensed skilled nursing facilities. Cal. Health & Safety Code § 1324.25 Accordingly, QA Fees raise revenue that allows the state to support Medi-Cal and promote improvements to skilled nursing facilities, and based on this it can be concluded that the QA Fees are imposed based on the state's taxing authority.

5. Whether a Private Creditor Similarly Situated to the Government Can Be Hypothesized Under the Relevant Statute

The next factor the court must consider is whether a private creditor similarly situated to the government can be hypothesized under the relevant statute. The Trustee argues that skilled nursing facilities are not limited to patients who receive care reimbursed under government-sponsored programs such as Medi-Cal, but also have patients whose care is covered by private insurance. The Trustee asserts that, to the extent that non-Medi-Cal patients of the Debtor have claims against the estate, their claims would not be priority claims.

Again, the Trustee's argument rests on a very narrow interpretation of the purpose of QA Fees. To be similarly situated to DHS in this case, a creditor would have to have a

---

[5] Trustee's Opening Supplemental Brief (Docket No. 480, 19:25).

claim based on the imposition of a flat fee that is tied to the number of patients the Debtor has in its facility each day. While the Trustee tries to characterize QA Fees as a "reimbursement" for residents who pay to use the skilled nursing facilities through Medi-Cal, the text of the legislation does not indicate that QA Fees are a reimbursement. The legislation imposing QA Fees states that the fees are based on the net revenue of skilled nursing facilities, which is "gross resident revenue for routine nursing services and ancillary services provided to all residents by a skilled nursing facility, less Medicare revenue…." Assembly Bill 1629 (Exhibit A to Declaration of Kenneth Wang, Docket No. 477). From the text of the bill, it is apparent that QA Fees are not a reimbursement for services provided to particular customers, but rather a flat fee based on revenues from housing all patients. While other creditors may have charged the Debtor for services provided to individuals, there is no hypothetical private creditor who could charge the Debtor a flat fee based on the number of patients the Debtor had each day. Accordingly, this fifth factor is satisfied.

        iii.   *Conclusion*

Because all five factors of the functional test for determining whether a claim is based on an excise tax are satisfied, the court concludes that QA Fees are an excise tax.

        b)   <u>Whether QA Fees Are an Excise Tax on a Transaction</u>

While the court has determined that QA Fees are an excise tax, this does not end the inquiry into whether DHS's claim based on QA Fees is a priority claim under section 507(a)(8)(E)(ii). The statute does not simply refer to an "excise tax," but rather to an excise tax "on a transaction." 11 U.S.C. § 507(a)(8)(E)(ii). In *Lorber II*, the Ninth Circuit acknowledged that a court's inquiry does not always end after applying the five-factor excise tax test: "[b]ecause we hold that the [creditor's] claim does not qualify as an excise tax, we do not reach the question of when the transaction giving rise to the tax occurred." *In re Lorber Indus. of California*, 564 F.3d at 1103. The logical implication of the Ninth Circuit's statement in *Lorber II* is that if a court were to find that a claim was an excise tax, the court would next determine whether that excise tax was on a transaction.

The Ninth Circuit also acknowledged that courts must determine not only whether a fee is an excise tax, but also whether a transaction occurred, in *In re DeRoche,* where the court stated:

> [w]e have previously held that reimbursement of the Special Fund is an "excise tax" within the meaning of § 507(a)(8)(E)(ii). In this case, we are asked to decide the date of the "transaction" on which this excise tax is based in order to determine the three-year period of non-dischargeability. We hold that a "transaction" is the act of employing a worker without carrying the required insurance when the worker is injured. The date of the transaction is thus the date on which the worker is injured.

*In re DeRoche*, 287 F.3d 751, 753 (9th Cir. 2002)(citations omitted). Accordingly, the court must determine whether QA Fees are related to a transaction.

DHS encourages the court to adopt a broad interpretation of what constitutes a transaction under section under section 507(a)(8)(E)(ii). DHS cites several out of circuit cases for the proposition that "transaction" should be construed broadly, including *In re National Steel Corp.*, 321 B.R. 901 (Bankr. N.D. Ill. 2005). In *National Steel Corp.* – a frequently cited case when courts in other circuits adopt a broad interpretation of "transaction" – the court held that "transactions are not limited to separate and distinct acts or specific taxable events." *In re Nat'l Steel Corp.*, 321 B.R. at 911.

While it does not appear that the Ninth Circuit has specifically addressed this issue, Ninth Circuit case law suggests that courts within the Ninth Circuit should adopt a narrower view of what constitutes a transaction. *See In re DeRoche,* 287 F.3d 751 (9th Cir. 2002). In *DeRoche,* the tax at issue was imposed by an Arizona statute requiring employers that do not carry workers' compensation insurance to reimburse a special fund used to pay workers' compensation claims. In considering this tax, the Ninth Circuit acknowledged that the transaction giving rise to the excise tax was not obvious and that there were a number of events that, taken together, resulted in the ultimate assessment of the "excise tax." *DeRoche*, 287 F.3d at 755. In determining what the ultimate transaction giving rise to Arizona's priority claim was, the court noted that "a fundamental characteristic of a typical

excise tax is that it is a discrete, one-time tax based on a single act by the person or entity taxed, such as a sale or an application for a license." *Id.* at 756. Ultimately, while acknowledging that there were several events leading to the excise tax, the Ninth Circuit determined that the single transaction of employing a worker was the transaction giving rise to the tax, so the claim was an excise tax on a transaction. *Id.* at 757. The Ninth Circuit's reasoning in *DeRoche* demonstrates that this court should determine whether there is a single transaction giving rise to QA Fees, not whether there are a series of transactions giving rise to QA Fees.

Another court has interpreted *DeRoche* to stand for the proposition that "not all excise taxes fall within the ambit of that subsection. [The movant] itself concedes that only excise taxes 'on a transaction' are entitled to Section 507(a)(8)(E) priority." *In re Albion Health Servs.*, 339 B.R. 171, 177 (Bankr. W.D. Mich. 2006), *aff'd*, 360 B.R. 599 (B.A.P. 6th Cir. 2007). The *Albion* court examined *DeRoche* to demonstrate the need to determine that there is a discrete taxable transaction for a fee to fall under section 507(a)(8)(E)(ii). *Id*. at 178-180.

Further, the canons of statutory construction direct that when interpreting a statute, a court must give the words in the statute meaning. *Boise Cascade Corp. v. U.S. E.P.A.*, 942 F.2d 1427, 1432 (9th Cir. 1991). To accept DHS's argument would read the phrase "on a transaction" out of the Code. This court believes that the better approach is to give meaning to this phrase and assess whether QA Fees are imposed on a discrete transaction.

At the hearing after supplemental briefing, when asked by the court to identify the transaction on which the QA Fees were imposed, counsel for DHS listed many possible "transactions" engaged in by skilled nursing facilities. Counsel for DHS asserted that skilled nursing facilities clothe patients, feed patients, and provide a bed to patients each day. Finally, DHS's counsel asserted that the relevant transaction could be that skilled nursing facilities care for a patient each month.

While skilled nursing facilities certainly engage in "transactions" each day in order to operate, DHS has not established that QA Fees are imposed on any single transaction. The record before the court does not support a finding that QA Fees arise out of a discrete transaction. There is no argument or analysis by DHS, for example, that QA Fees are calculated based on any of the possible "transactions" listed by DHS's counsel at the hearing. QA Fees are not based on the number of meals, beds, changes of clothing, or any other service provided to residents. QA Fees are not assessed when a new resident enters a facility. Rather, the terms of the legislation provide – and DHS's proof of claim makes clear – that QA Fees are recurring fees based on a skilled nursing facility's net revenue. The basis for DHS's claim is not a discrete one-time fee resulting from a transaction but rather a recurring charge for continuing operations. Accordingly, notwithstanding this court's finding that QA Fees are an excise tax, the court cannot find that the QA Fees are an excise tax on a transaction. DHS's claim is not entitled to priority under section 507(a)(8)(E)(ii). The claim will be allowed as a general unsecured claim.

The Trustee is instructed to lodge an order consistent with this memorandum.

###

Date: August 24, 2017

Deborah J. Saltzman
United States Bankruptcy Judge